**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-1773
_____

JOHN IVAN SUTTER, M.D.

v.

OXFORD HEALTH PLANS LLC,

Appellant

_____

On Appeal from the District Court
for the District of New Jersey
(No. 05-cv-2198)
District Judge: Honorable Garrett E. Brown

_____

Argued November 17, 2011

Before: FUENTES, CHAGARES, *Circuit Judges*, and
POGUE, *Judge*[*]

---

[*] Hon. Donald C. Pogue, Chief Judge, United States Court of
International Trade, sitting by designation.

(Opinion Filed: April 3, 2012)

Marc De Leeuw, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004

P. Christine Deruelle, Esq. [ARGUED]
Edward Soto, Esq.
Weil, Gotshal & Manges
1395 Brickell Avenue
Suite 1200
Miami, FL 33131

Adam N. Saravay, Esq.
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102

    *Counsel for Appellants*

Eric D. Katz, Esq. [ARGUED]
Mazie, Slater, Katz & Freeman
103 Eisenhower Parkway
Roseland, NJ 07068

    *Counsel for Appellee*

---

OPINION OF THE COURT

---

FUENTES, *Circuit Judge*:

Oxford Health Plans, LLC, and Dr. Ivan Sutter are parties to a Primary Care Physician Agreement, drafted by Oxford, which contains a broad arbitration clause. Neither the arbitration clause nor any other provision of the agreement makes express reference to class arbitration. Nevertheless, when a dispute arose regarding Oxford's alleged failure to make prompt and accurate reimbursement payments to participating physicians, an arbitrator construed the broad text of the clause to authorize class arbitration. Oxford contends that the Supreme Court's decision in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S. Ct. 1758 (2010), requires vacatur of the award authorizing class arbitration. We disagree, and we will affirm the Order of the District Court denying Oxford's motion to vacate the award.

**I**

By their 1998 Primary Care Physician Agreement (the "Agreement"), the parties agreed that Sutter would provide primary care health services to members of Oxford's managed care network in exchange for compensation at predetermined reimbursement rates. They also agreed to arbitrate their disputes under the Agreement by a clause that states:

> No civil action concerning any dispute arising
> under this Agreement shall be instituted before

any court, and all such disputes shall be submitted to final and binding arbitration in New Jersey, pursuant to the Rules of the American Arbitration Association with one arbitrator.

(App. 55).

A dispute arose in April 2002, when Sutter accused Oxford of engaging in a practice of improperly denying, underpaying, and delaying reimbursement of physicians' claims for the provision of medical services. Sutter filed a complaint on behalf of himself and a class of health care providers against Oxford and other health insurers in New Jersey Superior Court, alleging breach of contract and other violations of New Jersey law. Oxford moved to compel arbitration of Sutter's claims against it under the Agreement. Sutter opposed the motion, arguing that referral of the class claims to individual arbitration would violate New Jersey public policy. He urged the Superior Court either to refuse to enforce the clause or to certify the class before sending the claims to arbitration. In October 2002, the Superior Court granted Oxford's motion to compel arbitration and ordered that all procedural issues, including those of class certification, be resolved by the arbitrator.

The parties commenced arbitration before William L.D. Barrett and submitted to him the question of whether the arbitration clause in their Agreement allows for class arbitration. By memorandum and order dated September 23, 2003, he determined that it does. Framing the question as one of contract construction, the arbitrator turned first to the text of the arbitration clause. He described the clause as "much

4

broader even than the usual broad arbitration clause;" it was "unique in [his] experience and seem[ed] to be drafted to be as broad as can be." (App. 47). The arbitrator thus determined that the clause's first phrase, "No civil action concerning any dispute arising under this Agreement shall be instituted before any court," embraces all conceivable court actions, including class actions. Because the clause's second phrase sends "all such disputes" to arbitration, he reasoned that class disputes must also be arbitrated. Thus, the arbitrator concluded that the clause expressed the parties' intent to authorize class arbitration "on its face." (App. 48). He observed that an express carve-out for class arbitration would be required to negate this reading of the clause. He mused, however, that it would be bizarre for the parties to have intended to make class action impossible in any forum. Since he found the clause unambiguous, the arbitrator did not reach Sutter's argument that any ambiguity in the clause should be construed against its drafter, Oxford. The arbitrator subsequently incorporated this clause construction into his Partial Final Class Determination Award, dated March 24, 2005.

In April 2005, Oxford filed a motion to vacate the award in the District Court, arguing that the arbitrator had exceeded his powers and manifestly disregarded the law by ordering class arbitration. The District Court denied Oxford's motion in October 2005, and a panel of this Court affirmed in February 2007. *Sutter v. Oxford Health Plans, LLC*, No. 05-CV-2198, 2005 U.S. Dist. LEXIS 25792 (D.N.J. Oct. 31, 2005), *aff'd* 227 F. App'x 135 (3d Cir. 2007). The arbitration thereafter proceeded on a classwide basis.

5

This action represents Oxford's second foray into federal court to vacate the award authorizing class arbitration as in excess of the arbitrator's powers. Since Oxford's first unsuccessful attempt at vacatur, the Supreme Court decided *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 130 S. Ct. 1758 (2010), in which it held that an arbitral panel had exceeded its authority by allowing class arbitration when the parties had reached no agreement on the issue. *See id.* at 1775. Oxford contends that *Stolt-Nielsen* controls this case and compels the conclusion that the arbitrator's construction of the clause was in excess of his powers. Oxford first moved the arbitrator for reconsideration of his clause construction award, but the arbitrator distinguished *Stolt-Nielsen* and reaffirmed his construction of the parties' clause. Oxford then moved the District Court to vacate the arbitrator's most recent award or, in the alternative, to reconsider its own 2005 decision denying vacatur. The District Court denied Oxford's motion and granted Sutter's cross-motion to confirm the award. *Sutter v. Oxford Health Plans, LLC*, Nos. 05-CV-2198, 10-CV-4903, 2011 U.S. Dist. LEXIS 17123 (D.N.J. Feb. 22, 2011). Oxford appeals.

## II

The District Court exercised diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. We have jurisdiction over Oxford's appeal under the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(D) ("An appeal may be taken from . . . an order . . . confirming or denying confirmation of an award or partial award.").[1]

---

[1] Anomalously, the Federal Arbitration Act creates a body of federal substantive law without creating any independent

6

On appeal from a district court's ruling on a motion to confirm or vacate an arbitration award, we review its legal conclusions de novo and its factual findings for clear error. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947-48 (1995), *aff'g* 19 F.3d 1503, 1509 (3d Cir. 1994); *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 278-79 (3d Cir. 2003).

A more deferential standard of review applies to the arbitration award itself. We do not entertain claims that an arbitrator has made factual or legal errors. Rather, mindful of the strong federal policy in favor of commercial arbitration, we begin with the presumption that the award is enforceable. *See Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). An award may be vacated only upon one of the four narrow grounds enumerated in the Federal Arbitration Act:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;

federal-question jurisdiction. *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25 n.32 (1983). It does, however, confer appellate jurisdiction, including over interlocutory judicial orders. *See* 9 U.S.C. § 16(a). In a court of competent jurisdiction, assuming ripeness, interlocutory arbitral awards on the availability of class arbitration are reviewable under the Act. *See Stolt-Nielsen*, 130 S. Ct. at 1766-67 & n.2.

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). These grounds are exclusive and may not be supplemented by contract. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008), *overruling Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 288 (3d Cir. 2001). In sum, when parties agree to resolve their disputes before an arbitrator without involving the courts, the courts will enforce the bargains implicit in such agreements by enforcing arbitration awards absent a reason to doubt the authority or integrity of the arbitral forum. *See id.* at 586 (characterizing the exclusive statutory bases for vacatur as "egregious departures from the parties' agreed-upon arbitration").

The basis for vacatur asserted in this case, § 10(a)(4) of the Federal Arbitration Act, permits district courts to vacate awards when arbitrators exceed their powers. "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Volt Info. Scis., Inc. v.*

8

*Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). By contractually restricting the issues they will arbitrate, the individuals with whom they will arbitrate, and the arbitration procedures that will govern, parties to an arbitration agreement may place limits upon the arbitrator's powers that are enforceable by the courts. *See Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 181 (3d Cir. 2010) (en banc). An arbitrator oversteps these limits, and subjects his award to judicial vacatur under § 10(a)(4), when he decides an issue not submitted to him, grants relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issues an award that is so completely irrational that it lacks support altogether. *Ario v. Underwriting Members of Syndicate 53 at Lloyds for the 1998 Year of Account*, 618 F.3d 277, 295-96 (3d Cir. 2010) (citing *Mut. Fire, Marine & Inland Ins. Co. v. Norad Reins. Co.*, 868 F.2d 52, 56 (3d Cir. 1989)). In other words, the task of an arbitrator is to interpret and enforce a contract. When he makes a good faith attempt to do so, even serious errors of law or fact will not subject his award to vacatur. *See Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 243 (3d Cir. 2005) (upholding an arbitration award despite the arbitrator's inexplicable reliance on language not found in the relevant agreement). But when the arbitrator "strays from interpretation and application of the agreement and effectively 'dispenses his own brand of industrial justice,'" he exceeds his powers and his award will be unenforceable. *Stolt-Nielsen*, 130 S. Ct. at 1767 (quoting *Major League Baseball Players Ass'n. v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam) (quoting *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960))).[2]

---

[2] Like the Supreme Court, this Court will refer to the federal

An arbitrator may exceed his powers by ordering class arbitration without authorization. In *Stolt-Nielsen*, the Supreme Court held that arbitrators may not infer parties' consent to class arbitration procedures solely from the fact of their agreement to arbitrate. 130 S. Ct. at 1775. Therefore, an arbitrator lacks the power to order class arbitration unless there is a contractual basis for concluding that the parties agreed to that procedure. *Id.*

**III**

*Stolt-Nielsen* arose out of a Department of Justice investigation which revealed that Stolt-Nielsen and other shipping companies were engaged in an illegal price fixing conspiracy. *Id.* at 1765. AnimalFeeds and other customers of the shipping companies brought class action antitrust lawsuits, which were consolidated by the Judicial Panel on Multidistrict Litigation. *Id.* AnimalFeeds' suit was subsequently referred to arbitration on the basis of an arbitration clause in the "Vegoilvoy" charter party, a standard

---

common law developed under *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456-57 (1957), for judicial review of labor arbitration awards under the Labor Management Relations Act, 29 U.S.C. § 185, to elaborate the meaning of the Federal Arbitration Act's statutory grounds for vacatur. *See Swift Indus., Inc. v. Botany Indus., Inc.*, 466 F.2d 1125, 1130 & n.11 (3d Cir. 1972); *cf. Hall St.*, 552 U.S. at 585 (suggesting without deciding that the judicially created manifest disregard of law ground for vacatur may be properly considered only as a judicial gloss on the statutory grounds); *Stolt-Nielsen*, 130 S. Ct. at 1768 n.3 (same).

10

form shipping contract that AnimalFeeds had selected. *Id.* at 1764-65. When AnimalFeeds then sought to proceed in arbitration on a classwide basis, the parties agreed to submit the issue of class arbitration to a panel of three arbitrators. *Id.* at 1765. After hearing argument and testimony, the arbitrators concluded that class arbitration was permitted. *Id.* at 1766.

Before the arbitrators, the parties stipulated that the arbitration clause in the Vegoilvoy charter party was "silent" with respect to class arbitration, in the sense that they had not reached any agreement on that issue. *Id.* at 1766. "Counsel for AnimalFeeds explained to the arbitration panel that the term 'silent' did not simply mean that the clause made no express reference to class arbitration. Rather, he said, 'all parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue.'" *Id.* Thus, the arbitration clause was silent but "not ambiguous so as to call for parol evidence" because "the parties were in complete agreement regarding their intent." *Id.* at 1770 (internal quotation marks omitted). The arbitrators were bound to conclude that the parties intended neither to authorize nor to preclude class arbitration. *See id.*

The parties' stipulation left the arbitrators unable to apply traditional principles of contract interpretation. It obviously "left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task." *Id.* Nor could the panel construe the text of the arbitration clause because, in light of the parties' stipulation, "the particular wording of the charter party was quite beside the point." *Id.*

11

"Because the parties agreed their agreement was 'silent' in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation." *Id.* at 1768 (identifying the Federal Arbitration Act, federal maritime law, and New York law as possible sources of a governing rule). Instead, the panel based its decision that class arbitration was permitted on the parties' failure to contractually preclude the procedure and on other arbitral decisions construing other clauses to allow class arbitration. *Id.* In so doing, the Supreme Court held, the arbitrators impermissibly assumed the power of a common law court to fashion a rule of decision. *Id.* at 1769. By doing so, rather than interpreting the contract under the governing law, the arbitrators exceeded their powers within the meaning of § 10(a)(4) of the Federal Arbitration Act. *Id.* at 1770.

The Supreme Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). The Court therefore faulted the arbitrators for imposing class arbitration in the absence of any agreement on the issue and on the basis that the parties had not intended to *preclude* class arbitration. *Id.* Although parties may implicitly authorize arbitrators to adopt necessary procedures, the Court held that "[a]n implicit agreement to authorize class-action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate." *Id.* "[T]he differences between bilateral and class-action arbitration are too great for arbitrators to presume . . . that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class

12

proceedings." *Id.* at 1776; *see also AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1752 (2011) (further articulating the "fundamental" differences between bilateral arbitration and class arbitration).[3]

*Stolt-Nielsen* did not establish a bright line rule that class arbitration is allowed only under an arbitration agreement that incants "class arbitration" or otherwise expressly provides for aggregate procedures. *Stolt-Nielsen*, 130 S. Ct. at 1776 n.10; *Jock v . Sterling Jewelers Inc.*, 646 F.3d 113, 124 (2d Cir. 2011) (holding that an arbitrator did not exceed her powers by ruling that class arbitration was allowed under an agreement lacking an express class provision). The Court underscored this point, writing, "We have no occasion to decide what contractual basis may

---

[3] In *AT&T Mobility LLC v. Concepcion*, the Supreme Court held that the Federal Arbitration Act preempts a California common law rule invalidating class waivers in arbitration clauses as unconscionable. *See* 131 S. Ct. 1740, 1753 (2011). The Court found its decision in *Stolt-Nielsen* to be "instructive." *Id.* at 1750. Because class arbitration necessarily sacrifices the informality, speed, and cost savings of arbitration and increases the stakes without increasing the level of judicial scrutiny available under the Federal Arbitration Act, the Court found "it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision." *Id.* at 1752. Recognizing that parties *could* agree to class arbitration if they so chose, the Court held that this procedure may not be *required* by state law. *Id.* at 1752-53.

support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was 'no agreement' on the issue of class-action arbitration." 130 S. Ct. at 1776 n.10; *see also id.* at 1783 (Ginsburg, J., dissenting) ("[T]he Court does not insist on express consent to class arbitration.").

Instead, *Stolt-Nielsen* established a default rule under the Federal Arbitration Act: "[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). Absent a contractual basis for finding that the parties agreed to class arbitration, an arbitration award ordering that procedure exceeds the arbitrator's powers and will be subject to vacatur under § 10(a)(4).[4]

## IV

Oxford argues that the clause construction award at issue in this case should be vacated because the arbitrator

---

[4] Thus, the District Court misstated the law when it wrote that the arbitrator must decide whether the arbitration clause "forbids" class arbitration. *See Sutter v. Oxford Health Plans, LLC*, 2011 U.S Dist. LEXIS 17123, at *12 (quoting *Vilches v. The Travelers Cos.*, 413 F. App'x 487, 492 (3d Cir. 2011)). It is evident from the District Court's discussion, however, that it properly understood that *Stolt-Nielsen* allows class arbitration only where the parties intend to authorize it, as the arbitrator found they did in this case. In any event, upon de novo review under the appropriate standard, we conclude that the arbitration award stands.

14

exceeded his powers under *Stolt-Nielsen*. According to Oxford, "the arbitrator found that the arbitration clause between Sutter and Oxford is silent on the issue of class arbitration, but he went on to conclude that the clause permits class arbitration in light of its breadth and the absence of a class arbitration exclusion." (Appellant's Br. at 14). Oxford charges that the arbitrator imposed his own default rule, in derogation of *Stolt-Nielsen* and New Jersey law, based on his own conceptions of public policy.

As an initial matter, we reject Oxford's attempt to cast this case in the mold of *Stolt-Nielsen*. The arbitration clause in its Agreement does not refer to class arbitration. Yet it is not "silent" in the way that the Vegoilvoy charter party was "silent" in *Stolt-Nielsen*, and Oxford equivocates when it suggests otherwise.[5] No stipulation between Oxford and

---

[5] Oxford seems to suggest that an arbitration provision is "silent" whenever the words "class arbitration" are not written into the text of the arbitration clause. This rule finds no support in *Stolt-Nielsen*. It would effectively impose on all contracting parties an obligation to use the words "class arbitration" to signal their intention to authorize class arbitration. But *Stolt-Nielsen* did not purport to restrict the freedom of contracting parties in this way. Rather, it repeatedly emphasized that the fundamental duty of the arbitrator and the courts to effectuate parties' intentions. *Stolt-Nielsen*, 130 S. Ct. at 1773-74. Oxford's approach would cabin the freedom of contracting parties, safeguarded by the Federal Arbitration Act, to structure their arbitration provisions as they see fit. *See id.* at 1774 ("Underscoring the consensual nature of private dispute resolution, we have held that parties are generally free to structure their arbitration

Sutter is conclusive of the parties' intent and, indeed, the parties dispute whether or not they intended to authorize class arbitration. Therefore, the arbitrator in this case was not constrained to conclude that the parties did not intend to authorize class arbitration or, on the other hand, to identify a contrary default rule of New Jersey law. *Cf. Stolt-Nielsen*, 130 S. Ct. at 1769-70. His decision to order class arbitration is within his authority so long as it stands on a contractual basis. *See id.* at 1775.

As Oxford concedes, the arbitrator did articulate a contractual basis for his decision to order class arbitration. Appropriately, the arbitrator made first resort to the text of the arbitration clause:

> No civil action concerning any dispute arising under this Agreement shall be instituted before any court, and all such disputes shall be submitted to final and binding arbitration in New Jersey, pursuant to the Rules of the American Arbitration Association with one arbitrator.

(App. 55). He reasoned that the clause's first phrase, "No civil action concerning any dispute arising under this Agreement shall be instituted before any court," is broad enough to include class actions. Thus, its second phrase, "and all such disputes shall be submitted to final and binding arbitration in New Jersey, pursuant to the Rules of the American Arbitration Association with one arbitrator," sends

agreements as they see fit.") (internal quotation marks and citation omitted).

16

all conceivable civil actions—including class actions—to arbitration. In other words, the phrase "no civil action . . . shall be instituted in any court" meant that a class action may not be instituted in a court of law. "All such disputes" must go to arbitration.

Oxford attacks the contractual basis for the arbitrator's decision by asserting that the arbitrator's purported examination of the parties' intent was pretext for the imposition of his policy preferences. *See Stolt-Nielsen*, 130 S. Ct. at 1769-70 (concluding that the arbitral panel had impermissibly imposed its preferred policy notwithstanding its references to the parties' intent, where the parties stipulated that they had formed no intent). According to Oxford, if the arbitrator were actually desirous of determining the parties' intent, he would have sought it not in the text of their agreement to arbitrate but instead in their briefing before the New Jersey Superior Court. In that forum, Sutter opposed enforcement of the arbitration agreement on the ground that it would send the dispute to individual arbitration, which, he argued, would be contrary to New Jersey public policy. Oxford argues that Sutter's submissions to the Superior Court, together with Oxford's own representations that its Agreement did not contemplate arbitration on a classwide basis, were tantamount to a stipulation that the parties did not intend to authorize class arbitration. *Cf. id.* at 1766.

Oxford's argument lacks force because Sutter's litigation position in the Superior Court is not conclusive, or even particularly probative, of the meaning of a clause drafted solely by Oxford. *Cf. id.* at 1775 (relying on the stipulation of the sophisticated business entity that had selected the charter party). We observe, further, that Sutter's litigation position

was not uniform: Sutter alternatively urged the Superior Court to certify the class before sending the claims to arbitration, and he argued before the arbitrator that the clause could be construed to affirmatively authorize class arbitration. Without a conclusive statement of the parties' intent or clear evidence of arbitral overreaching, we must conclude that the arbitrator performed his duty appropriately and endeavored to give effect to the parties' intent. In this light, Oxford's allegations of pretext are simply dressed-up arguments that the arbitrator interpreted its agreement erroneously.

The remainder of Oxford's arguments are similarly uncognizable claims of factual and legal error. In particular, Oxford argues that the arbitrator improperly inferred the parties' intent to authorize class arbitration from the breadth of the parties' arbitration agreement and from its failure to preclude class arbitration. In his clause construction award, the arbitrator remarked that the parties' arbitration clause was unique in its breadth. Construing the broad text and structure of the clause, he concluded that the parties affirmatively intended to authorize arbitration on a classwide basis. Then, given his construction of the clause, the arbitrator noted that an express exception for class arbitration would be required to carve out and prohibit class arbitration. Oxford submits that the arbitrator thereby relied on two grounds that *Stolt-Nielsen* had expressly proscribed.

The arbitrator unquestionably relied on the breadth of the arbitration agreement, but *Stolt-Nielsen* does not proscribe such reliance. Rather, it acknowledges the relevance of an arbitration agreement's breadth to the determination of whether it authorizes class arbitration. In *Stolt-Nielsen*, the Supreme Court concluded that the arbitration panel "imposed

18

its own conception of sound policy" in derogation of its duty to interpret the arbitration agreement and apply the law. 130 S. Ct. at 1769. The Court acknowledged indications that were arguably contrary to its conclusion: The panel had referred to the parties' intent and had commented on the breadth of the arbitration agreement. *Id.* at 1770. But the Court nonetheless held that these references and comments could not overcome the parties' stipulation that they had reached no agreement on the issue of class arbitration. In light of the parties' stipulation, "the panel had no occasion to ascertain the parties' intention" and "the particular wording of the charter party was quite beside the point." *Id.* (internal quotation marks omitted). The lesson from this discussion is that where, as here, the parties' intent with respect to class arbitration is in question, the breadth of their arbitration agreement is relevant to the resolution of that question.

*Stolt-Nielsen* does prohibit an arbitrator from inferring parties' consent to class arbitration solely from their failure to preclude that procedure, but the arbitrator did not draw the proscribed inference in this case. Rather, the arbitrator construed the text of the arbitration agreement to authorize and require class arbitration. Then he observed that an express carve-out for class arbitration would have made it unavailable even under the clause's otherwise broad language. As the arbitrator later articulated when he revisited his construction of the clause in light of *Stolt-Nielsen*, the lack of an express exclusion was merely corroborative of his primary holding that the parties' clause authorized class arbitration; it was not the basis of that holding. Thus, the arbitrator did not impermissibly infer the parties' intent to authorize class arbitration from their failure to preclude it.

19

We are satisfied that the arbitrator endeavored to interpret the parties' agreement within the bounds of the law, and we cannot say that his interpretation was totally irrational. Nothing more is required under § 10(a)(4) of the Federal Arbitration Act.

## V

Because the arbitrator did not exceed his powers by construing the parties' arbitration agreement to authorize class arbitration, we will affirm the Order of the District Court.